### JENNINGS v. SMITH.

(Circuit Court of Appeals, Seventh Circuit.   January 2, 1901.)

#### No. 683.

1. CARRIERS—CONTRACT OF SHIPMENT—LIMITATION OF LIABILITY.

   A written contract between a shipper and a common carrier, by which it is stipulated, in consideration of a reduced rate for carriage, that the value of the articles shipped shall be limited to a stated amount, is not void as against public policy, as relieving the carrier from liability for negligence.

2. SAME—CONTRACT—EXECUTION—DURESS—FRAUD—TRIAL—INSTRUCTIONS.

   A shipper applied to the general freight agent of a railroad for the same reduced rate on live stock which he had previously received, and was granted it, on the same conditions as before, one of which was that he executed the written contract usual in such cases. When the shipment was ready, the shipper was tendered, by a clerk, a written contract for his signature, in which the valuation of the stock was limited to a much smaller amount than its true value. The shipper objected that the value was not right, but was told by the clerk that it was merely a form, whereupon the shipper executed the contract. There was no evidence that the clerk had any authority to vary the contract, and the contract expressly stated that he had none. *Held,* in an action for injuries to the live stock from the carrier's negligence, that an instruction that the shipper was bound by the limitation of liability in the contract was proper, since the fact that the shipper was obliged to sign the contract in order to obtain the reduced rate did not establish duress, and the remarks of the clerk at the time of the execution did not constitute fraud in procuring the contract.

In Error to the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

Action by George F. Jennings against Charles W. Smith, as receiver of the Atlantic & Pacific Railway Company. From a judgment of the United States circuit court for the Northern division of the Northern district of Illinois, plaintiff brings error. Affirmed.

The plaintiff in error was the plaintiff below in an action against the defendant, as a common carrier, for injuries to four coach horses and loss of other property, caused by a collision through the negligence of the defendant while transporting the property from Chicago to California. Although the

action was tried under additional counts in case, the testimony of the plaintiff disclosed the fact that the transportation was furnished at special rates, under a special contract with the initial carrier at Chicago, the Atchison, Topeka & Santa Fé Railway Company, stipulating, among other matters, that the rate given "is lower than the rate made by the railway company for the transportation of stock at carriers' risk, and without limitation of liability, and is based upon the conditions and agreements found in this contract, and upon the valuations therein fixed"; that the shipper accepts the conditions by signing the contract; that the shipment is for tender or delivery only to connecting carriers, and the guaranty of through rate is on condition that the shipper execute like contract to and with the connecting carrier on demand: that the shipper "represents and agrees that his live stock does not exceed in value the price below named" (which is $100 per head for the horses); and that the liability of the company in case of loss or damage shall be based on such valuation, and not exceed the same. This contract was signed by the plaintiff with the understanding that the initial carriage thereunder terminated at Albuquerque, N. M., where delivery was to be made to the defendant as connecting carrier, and that the plaintiff was there to enter into like special contract with the defendant for carriage to destination; and delivery was made and the contract in controversy was executed accordingly. The injury occurred on the defendant's line under the latter contract, and was caused by a rear-end collision, resulting from negligence in the operation of the defendant's trains. The extent of the injury was thus stipulated at the trial: "The total value of the four horses after the accident was $90," and the value of the other property destroyed was $125. Proof was received on behalf of the plaintiff, under objection, that the actual value of the horses as delivered for carriage was $2,500 to $3,000. The contention on the part of the plaintiff that the special contract was not binding upon him, aside from the argument upon grounds of public policy, rests upon the circumstances attending its execution, which are thus stated substantially by the several witnesses: The plaintiff applied for through rates at the Chicago office, and the regular tariff rate was quoted, but he then answered "that was entirely too high; that Mr. Bissell [the general freight agent] would certainly do better than that for him," as he had done the year before for the same service. They then went to Mr. Bissell, who authorized giving "him the benefit of the same rate 'on this shipment" (the so-called "emigrant movable rate"), the plaintiff to furnish the special car required for the horses, and to execute the special contract for such rate when ready for shipment. The plaintiff further testified (under objection, "as tending to show some different agreement") that he went to the freight office for the contract when the car was loaded, and had the following colloquy with the clerk who tendered the contract for signature: "I objected to signing that on account that my horses were more valuable than that. He said that that did not cut any figure. I made a vigorous kick. He said it didn't cut any figure, and was merely a form." The contract was then executed; and the plaintiff further stated that he signed the same contract for the previous shipment, and "made the same fuss about it too." The plaintiff's coachman was present when the contract was executed, and states that the plaintiff examined it, and said, "This is drawn up just as it was the year before." At the close of the testimony the court instructed the jury that the plaintiff was bound by the valuation of the horses stated in the contract, and directed a verdict accordingly at the valuations otherwise stipulated, finding the defendant guilty, and assessing the plaintiff's damages at $435. Exceptions being duly preserved to such instruction, the plaintiff assigns error thereupon in various forms, substantially stating two grounds: (1) That the contract is void as an attempt against public policy to limit the common-law liability of the carrier; (2) that there was evidence that the contract was not fairly made, but was obtained by false representations, raising an issue of fact which should have been submitted to the jury. The opinion of the trial court on motion for a new trial is reported (C. C.) 99 Fed. 189.

James C. McShane, for plaintiff in error.
Robert Dunlap and C. N. Steny, for defendant in error.

Before WOODS and GROSSCUP, Circuit Judges, and SEAMAN, District Judge.

SEAMAN, District Judge, after making the foregoing statement, delivered the opinion of the court.

The material facts in the case are undisputed. The plaintiff in error, desiring shipment of four coach horses, with accompanying property and attendants, from Chicago to San Diego, Cal., applied for through rates of freight, and was informed of the regular tariff rates for such transportation. These were unsatisfactory, being higher than he had paid on a previous shipment under special contract, and on reference to the general agent a lower rate was granted, for which he was required to make a special written contract. A contract was prepared and executed accordingly between the plaintiff in error, as shipper, and the Atchison, Topeka & Santa Fé Railway Company, which specified that the rate given was lower than that made by the company "for the transportation of stock at carrier's risk, and without limitation of liability"; that the shipper agreed that each horse did not exceed in value $100; that the liability of the company was limited to the valuation so fixed; that such initial carrier should transport to Albuquerque, the terminal of its line, and then deliver to the connecting carrier; and that the through rate was guarantied "only on condition that the shipper" should execute with the connecting carriers "a contract similar in terms" to forward to destination. The contract in question was thus made in like terms between the shipper and the defendant in error as such connecting carrier. The validity of a contract which so limits the amount of the carrier's liability for a breach, in consideration of reducing the rate of transportation, if it is in truth the agreement of the parties, is not an open question in the federal jurisdiction, though the decisions elsewhere are at variance. In Hart v. Railroad Co., 112 U. S. 331, 336, 5 Sup. Ct. 151, 28 L. Ed. 717, a contract was upheld with like provisions, and the opinion (page 343, 112 U. S., page 157, 5 Sup. Ct., and page 722, 28 L. Ed.), after reviewing the authorities, thus states the rule adopted by that court:

"The distinct ground of our decision in the case at bar is that, where a contract of the kind signed by the shipper is fairly made, agreeing on the valuation of the property carried, with the rate of freight based on the condition that the carrier assumes liability only to the extent of the agreed valuation, even in case of loss or damage by the negligence of the carrier, the contract will be upheld as a lawful and proper mode of securing a due proportion between the amount for which the carrier may be responsible and the freight he receives, and of protecting himself against extravagant and fanciful valuations. Squire v. Railroad Co., 98 Mass. 239, 245, and cases cited."

The agreement is one of valuation only to limit the amount of liability in the event of a breach, and, if the agreed valuation is substantial, and not unreasonable in a general sense, it does not violate the well-settled rule that the carrier can obtain no exemption in advance from its common-law liability for negligence on the part of itself or its servants through any form of stipulation; and is thus clearly distinguishable from Railroad Co. v. Lockwood, 17 Wall. 357, 21 L. Ed. 627. As remarked by Mr. Justice Blatchford in the Hart Case, 112 U. S. 340, 5 Sup. Ct. 156, 28 L. Ed. 721:

"The limitation as to value has no tendency to exempt from liability for negligence. It does not induce want of care. It exacts from the carrier the measure of care due to the value agreed on. The carrier is bound to respond in that value for negligence. The compensation for carriage is based on that value. The shipper is estopped from saying that the value is greater. The article has no greater value for the purposes of the contract of transportation between the parties to the contract. The carrier must respond for negligence up to that value. It is just and reasonable that such a contract, fairly entered into, and where there is no deceit practiced on the shipper, should be upheld. There is no violation of public policy. On the contrary, it would be unjust and unreasonable, and would be repugnant to the soundest principles of fair dealing and of the freedom of contracting, and thus in conflict with public policy, if a shipper should be allowed to reap the benefit of the contract, if there is no loss, and to repudiate it in case of loss."

The stipulations of the purported contract for transportation in the case at bar were, therefore, not against public policy. It was clearly within the power of the parties to make such agreement, and the purpose of securing lower rates (both expressed in the contract and stated in the testimony of the plaintiff in error) furnishes reasonable ground for entering into it. The fact of signing such agreement is conceded, and, unless the testimony fairly raises an issue of deceit or unfair dealing in procuring the signature and assent to its terms, the verdict was rightly directed, as the further stipulations which were made at the trial left no valuation undetermined except that of the coach horses prior to their injury. Is the contention for such impeachment of the contract supported by evidence? Manifestly not in the negotiations between the shipper and the general freight agent whereby the lower rate was agreed upon, because it is undisputed that both rate and terms were identical with those made between the same parties for the same property and destination in the previous year, including the requirement of signing the special agreement as to valuation when the shipment was made, of which both mention by the agent and understanding on the part of the shipper is shown. The amount which was first demanded for transportation in the usual course, without limit as to value, is not shown, nor is any evidence introduced to raise an issue as to the reasonableness of the charge in that view, and it is plain that no presumption of unreasonableness can be entertained. It is equally clear from the terms of the contract which was signed by the shipper that "the rate of freight is graduated by the valuation," and it must be presumed, in the absence of evidence to the contrary, that the rate charged was based on the agreed valuation. Hart v. Railroad Co., 112 U. S. 337, 5 Sup. Ct. 154, 28 L. Ed. 720. The testimony of the plaintiff in error discloses his knowledge of the valuations named in the special contract both from his previous transaction and from his mention of it when the contract was presented for signature, so that no question is raised as to his understanding of the fact that a valuation of $100 for each horse was stated in the contract when it was signed. The claim that his signature was obtained by imposition or fraud rests alone, therefore, on an alleged conversation with a clerk in the freight office, after delivery of the property for shipment, when he called for the contract. He testified that he then "objected to signing" it because his "horses were more valuable than that," and "made the same fuss

about it" he had on the previous shipment; but the clerk replied that "it didn't cut any figure, and was merely a form," and he thereupon signed and accepted the contract. This testimony, if admissible for any purpose, cannot serve to modify or explain the unmistakable language of the instrument. The terms were previously arranged between the shipper and the general officer of the company, and, so far as appears, the clerk at the freight office was merely engaged in carrying out that arrangement. Without proof tending to show either express or implied authority in the clerk to bind the company by oral promises, it is not apparent how any statements made by him could have such effect under the circumstances stated, irrespective of the express provision of the contract against such authority. Treating the transaction, however, as one in which the clerk represented the carrier in his alleged remarks, no ground is presented for setting aside the contract for duress or fraud in the making. It is true that the shipper could not obtain the benefit of the cheaper rate without entering into the stipulation of limited valuation, but there was no duress in demanding such agreement, or in requiring that it be signed by the shipper, before receiving the property for shipment at the reduced rate; and the alleged statement by the clerk that "it didn't cut any figure, and was merely a form," does not establish fraud in procuring the signature in the face of the fact that the contract was executed by the shipper with full knowledge that the valuation was distinctly stated therein as the limit of liability. As the testimony was insufficient to impeach the execution of the contract, its submission to the jury for that purpose was neither necessary nor proper; and its submission by way of modifying the terms would have been an innovation on established principles, for the reason that "whatever passed between the parties before the bill of lading was signed was merged in the valuation as fixed." Hart Case, 112 U. S. 337, 5 Sup. Ct. 154, 28 L. Ed. 720.

We are of opinion that the instructions to the jury were in accord with these views, and, no reversible error appearing in the record, the judgment below is affirmed.